van Gestel, J.
This matter is before the Court on a motion by the plaintiff, G.D. Mathews & Sons Corp. (“Mathews”), to disqualify the law firm of Choate, Hall & Stewart, and any lawyer thereat (collectively “CHS”), from representing the defendant, MSN Corporation d/b/a Budd Foods (“MSN” or “Budd Foods”), in this matter. Mathews contends that disqualification is required under Rule 1.9(a) of the Massachusetts Rules of Professional Conduct.

BACKGROUND

Mathews and MSN are business competitors. They both distribute fresh chicken, meat, and fish pies manufactured by Budd Foods. In this suit, Mathews claims that MSN misappropriated accounts that are allocated to Mathews under an exclusive distribution agreement between the parties. Mathews argues that MSN breached the distribution agreement and committed unfair and deceptive acts and practices in violation of G.L.c. 93A.
MSN has filed a counterclaim charging Mathews with failure to use its “best efforts” to market Budd Foods chicken pies as required by the distribution agreement, and that Mathews interpretation of the agreement constitutes a breach of the covenant of good faith and fair dealing and a violation of c. 93A and the antitrust laws.
In 1979, Irving Budd, founder and former owner of Budd Foods, Inc., a manufacturer and marketer of chicken pies under the “Mrs. Budd’s” pie lable, sold his company, and all of the recipes, formulas and processes used to make Mrs. Budd’s chicken pies, to MSN. Following this sale, MSN and Mathews remained as the main competitors in the New England pie market, with each distributing pies manufactured by MSN — MSN using the Mrs. Budd’s label and Mathews under the “Mathews” label. Their customers were retail groceiy stores and supermarkets.
In 1987, the two competitors entered into an arrangement under which Mathews would stop selling its Mathews-labeled fresh pies and become the exclusive distributor of Mrs. Budd’s-labeled chicken, fish and meat pies in the New England area. This was the distribution agreement first mentioned above. The two also agreed to allocate between them the supermarket accounts which each would service from 1987 forward.[1]
In 1995, Irving Budd re-emerged in the chicken and meat pie marketplace with a new pie line marketed under the “Irving’s Kitchen” name. MSN, believing this to be a violation of its agreement with Irving Budd, brought suit in 1995 (“the 1995 suit”). MSN claimed that Irving Budd’s pie line was essentially a knock-off of the Mrs. Budd’s line that was acquired by it in 1979. MSN was represented in the 1995 law suit by CHS and the same individual lawyer that represents MSN here.
In the 1995 law suit, Irving Budd brought counterclaims against MSN, and third-party claims against Mathews, claiming that they conspired to carve up the New England chicken pie market between them and exclude others in violation of the antitrust laws and G.L.c. 93A. MSN instructed CHS to defend Mathews, at MSN’s expense, a situation that Mathews readily accepted. There was no actual or potential conflict between Mathews and MSN at that time.
*482 The 1995 suit was dismissed by a settlement in 1997. Mathews was not advised of the details of the settlement.
The Irving’s Kitchen line of pies survived the settlement of the 1995 suit. MSN, for the second time, purchased Irving Budd’s plant. Thereafter, MSN continued to distribute the Irving’s Kitchen pies to, among others, retailers that had been specifically allocated to Mathews in its distributoship agreement with MSN.
When Leo Mathews of Mathews, in 1997, wrote to CHS seeking information about the 1995 settlement with Irving Budd, he was provided only with copies of releases, along with a letter purporting to explain why CHS could not provide any additional documents.
Thereafter, in 1997 and 1998 Mathews and MSN negotiated over the continued sale by MSN of Irving’s Kitchen pies to Mathews’s accounts. In April of 1998, MSN and Mathews executed an amendment to the distributorship agreement which partially compensated Mathews for the losses that it had claimed.
In this action, Mathews’s attorneys have attempted to obtain more information about the factual and legal connections between the 1995 suit and this one. MSN has refused to produce all of the documents, and a motion to compel is pending. To date a large number of pleadings and some heavily redacted documents have been provided, along with an equally heavily redacted version of the 1995 settlement agreement.
Mathews’s counsel argue that from the documents produced, even as redacted, it is clear that the 1995 case and this action are substantially related.
MSN and CHS argue that disqualification is not required because CHS’s representation of Mathews in the 1995 case was as an accommodation client, was limited in time and scope, concerned a matter that is completely unrelated to this litigation, and involved legal and factual issues distinct from those at bar. They also argue a waiver by Mathews for waiting too long to bring the motion.

DISCUSSION

Any analysis of the present motion must begin with Rule 1.9(a) of the Massachusetts Rules of Professional Conduct. It reads in its entirety:
A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person’s interests are materially adverse to the interests of the former client unless the former client consents after consultation.
Here CHS unquestionably fits within the rule in all respects, except possibly for the question of whether the present case and the 1995 Irving Budd litigation involved “substantially related” matters or Mathews consented to the current representation after consultation.
Taken in reverse order, it seems clear to this Court that Mathews was never consulted about the CHS representation in this case and, therefore, cannot be said to have consented thereto. Nor, under the circumstances of its limited knowledge about the 1995 law suit, can it be said that Mathews waited too long to raise the conflict issue here.
The entire matter turns on the substantiality of the relationship between the matters in the 1995 litigation and the matters presented here. And this is a subject that still lacks clarity in Massachusetts. See, e.g., Adoption of Erica, 426 Mass. 55, 61-62 (1997).
This Court agrees with Justice Sosman’s reading of Bays v. Theran, 418 Mass. 685 (1994), in Dee v. Conference Holdings, Inc., 8 Mass. L. Rptr. 708, Middlesex Superior Court, No. 97-0608. The primary purpose of the “substantially related” test is to preserve client confidences by avoiding an “intolerably strong temptation” to betray them. Id. at p. 4.
The Court is quite aware of the desirability of giving deference to an attorney’s best judgment as to whether his representation of a client brings him into conflict with provisions of the disciplinary code. Adoption of Erica, supra, 426 Mass. at 63. Similarly, the Court is sensitive to the fact that disqualification may have a serious consequence for attorney and client alike. 1 G.C. Hazard & W.W. Hodes, The Law of Lawyering, Sec. 1.9:112, at 304.
Here, however, CHS finds itself in an exquisitely awkward position that may make its own assessment of its position difficult. Its long-time client MSN entered into a 1987 agreement with Mathews that may be violative of the antitrust laws. Whether CHS was involved in the drafting of that agreement is not clear. CHS later represented both MSN and Mathews in the 1995 case in which the defendant counterclaimed against MSN and third-party complained against Mathews that the agreement between MSN and Mathews was violative of the antitrust laws. CHS was the representative of both MSN and Mathews in the settlement of that 1995 suit, but now, apparently out of obligations to MSN, declines to fully advise or inform its former client, Mathews, about all of the details of that settlement. And now CHS is defending MSN against a suit by Mathews over compliance with the present version of the 1987 agreement between Mathews and MSN. and as part of that defense CHS has raised the spect-. - that the agreement, as interpreted by Mathews, may indeed be violative of the antitrust laws. For CHS to be successful on the latter may be as harmful to its present client, MSN, as to its former client, Mathews.
It is hard to envision which way the “temptation” to reveal to or use Mathews’s confidences for the benefit of MSN may run. It is equally difficult to assess whether CHS should or will conceal Mathews’s confidences from MSN and thereby fail to effectively represent MSN in this case.
*483 To this Court, however, there is substantiality to the relationship between the antitrust charges against MSN and Mathews involved in the 1995 litigation and that presented by CHS as a defense on behalf of MSN against Mathews here. Counsel ought not have put themselves in such a thicket. CHS could have avoided it all by not coming into this action in defense of MSN without the consent of Mathews, or by not staying in it, once CHS became aware that the antitrust issues were a serious focus. This put the firm and its lawyers in the ethically impossible position of either revealing or using confidences against Mathews, a former client, or failing to effectively and zealously advocate for MSN, another client, in the defense of the present action. In addition to Rule 1.9(a) of the Rules of Professional Conduct, it would seem that Rules 1.3, 1.6(a) and 1.7(b) also may be impacted in the present situation.

ORDER

For the foregoing reasons, the plaintiffs motion to disqualify, is ALLOWED. MSN Corporation shall have until August 3, 2001, to retain new counsel and affect a change in representation. The Court will hold a Rule 16 status conference for purposes of scheduling the remainder of this case at 2:00 p.m. on August 13, 2001.

 This Court has insufficient information about this arrangement at this time to comment upon its antitrust or other anti-competitive implications. Counsel for the litigants, however, would be wise to look into the issues.